UNITED STATES of America, Appellee,

v.

**Curtis Gale DOBY, Appellant.**

**No. 78–1840.**

United States Court of Appeals, Eighth Circuit.

Submitted April 16, 1979.

Decided May 16, 1979.

Paul A. Zoss, Austin, Myers, Peterson & Gaudineer, Des Moines, Iowa, argued and on brief, for appellant.

Richard G. Blane, II, First Asst. U. S. Atty., Des Moines, Iowa, (argued), and Roxanne Barton Conlin, U. S. Atty., Des Moines, Iowa, on brief, for appellee.

Before STEPHENSON and McMILLIAN, Circuit Judges, and BOGUE,* District Judge.

STEPHENSON, Circuit Judge.

Defendant Doby appeals from his conviction by a jury on a two-count indictment charging in Count I armed robbery of a bank in violation of 18 U.S.C. § 2113(d), and in Count II conspiracy with Riley Ray Fultz and John Stanley Campbell to rob the same bank.[1] Defendant contends there was trial error in (1) admitting defendant's confession into evidence; (2) failing to grant a mistrial because of the testimony of an FBI agent inferring that defendant had a prior criminal record; and (3) allowing the government to amend the indictment to change the name of the bank that was robbed. We affirm.

On May 19, 1978, at approximately 3:50 p. m. three men entered and robbed the Brenton Bank of South Des Moines. The robbers left with over $24,000, which included 25 "bait" bills. One of the bank robbers was described as wearing a ski cap over his face, another as wearing a ladies nylon stocking over his face and the third wore a red baseball cap. All three were armed with firearms. The robber wearing the baseball cap counted to 60 while the other two took money from the tellers. One of the robbers took a revolver from a bank guard during the robbery. The robbers left the bank in a stolen car and switched to another car a few blocks from the bank.

On May 24, five days after the robbery, Special Agent Hartung of the FBI's Houston division was conducting an investigation to determine the whereabouts of Riley Ray Fultz. Fultz and two other individuals had escaped from the custody of the Texas Department of Corrections, and the FBI had filed complaints charging the three with unlawful flight to avoid confinement. On that date Agent Hartung received information from an agent in Shreveport, Louisiana, that Fultz and the other two escapees had some connection with Curtis Gale Doby (appellant) of Splendora, Texas. All three escapees were reported armed and dangerous. Agent Hartung and Captain Walker, of the Montgomery County, Texas, sheriff's department, drove by the Doby residence looking for a white over blue Oldsmobile that had been connected with Fultz. It was not observed that day but was noted along with other vehicles at the Doby residence the next day.

On May 26, 1978, at approximately 9:00 a. m. the sheriff's department commenced a surveillance of the Doby residence. At approximately 3:00 p. m. FBI agents joined county deputies, including Captain Walker, in surrounding the Doby residence to await the arrival of a 1967 Chevrolet, which Captain Walker had spotted the day before, but was gone at the time. Earlier in the day during the course of the surveillance three officers interviewed Mrs. Nash, who lived in a trailer about 50 feet behind the Doby house. She advised them she had used the telephone in the Doby house around noon that day but had seen no one in the house at the time. She told them the house key was hidden in the flower pot in front of the house. A short time later she observed one of the officers exit the Doby house through the back door and then reenter the house.

At approximately 7:00 p. m. the 1967 Chevrolet arrived on the premises. Doby, his wife, Glenda, and Fultz were restrained immediately as they got out of the vehicle. Fultz and Doby were searched and a quantity of money was found on Fultz, some of which was later identified as bait bills taken from the Brenton Bank of South Des

---

* The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

1. The Honorable William C. Stuart, Chief Judge, United States District Court for the Southern District of Iowa, presiding, imposed a sentence of 20 years on Count I and 5 years on Count II, to run concurrently with the sentence on Count I.

Moines. After handcuffing Fultz, Captain Walker reached under the front passenger's seat of the car, where Fultz had been sitting, and retrieved a revolver. Using the key found in the flower pot, Captain Walker and another officer entered the house over the objections of Doby, ostensibly for the purpose of determining whether other persons sought under the fugitive warrant were in the house. At the suppression hearing Walker testified that he had no knowledge that other officers had entered prior thereto. He testified that after he entered the house he found narcotics in plain view.

Thereafter, other officers including one of the FBI agents completely searched the residence and seized a large number of articles, including the revolver which was later determined to have been taken from the Brenton Bank guard during the robbery on May 19. At some time during the search of the residence, one of the officers removed a shotgun from the trunk of Doby's auto.

After the narcotics were found in the house, Captain Walker advised the Dobys that they were under arrest on narcotics charges. One of the officers advised the Dobys of their *Miranda* rights. At approximately 9:45 p. m. Doby was taken before a justice of the peace, where he was charged under Texas law with knowing possession of a usable quantity of marijuana and placed in custody at the Montgomery County Jail.[2] The FBI agents took Fultz to Huntsville, Texas, and turned him over to the prison authorities of the Texas Department of Corrections.

On June 6 FBI Agent Venables obtained a statement from one Paula Ross Skrove implicating Curtis Doby, Riley Fultz and John Campbell in the May 19th robbery of the Brenton Bank of South Des Moines. Shortly thereafter it was learned that the revolver found in the Doby residence had been taken from the bank guard during the robbery of the Brenton Bank of South Des Moines and some of the money found on Fultz at the time of his arrest was bait money from the same bank.

On June 8, FBI Agent Marshall went to the Montgomery County Jail, where he took Doby's fingerprints and secured the money that had been recovered on the day of Doby's arrest. Agent Marshall then returned to interview Doby regarding the robbery of the Des Moines bank.

Agent Marshall told Doby that he wished to discuss the bank robbery and then advised Doby of his rights by reading the standard FBI advice of rights form. Doby stated that he understood his rights but refused to sign the form. Doby then agreed to talk to Agent Marshall.

Agent Marshall told Doby that the revolver and money found on the day of the arrest were connected with the Des Moines bank robbery; the revolver was determined to have belonged to the bank guard and the money was part of the bank money; and furthermore, that another person[3] had al-

---

2. Two days later a "hold" was placed on Doby by Tarrant County, Texas (Fort Worth), officials for a burglary charge.

3. The agent did not identify the person giving the statement or the details thereof. The person was Paula Ross Skrove. She later testified at the trial that prior to the robbery she had been living with Fultz near Houston, Texas; that at Fultz's telephonic request she flew with Doby to Des Moines where they met Fultz; that the next day the bank robbery occurred. She described several events in connection with the robbery—the purchase of a green car that was used, the presence of the conspirators in a motel room with two pistols, a sawed-off shotgun, a wig, a baseball cap, sunglasses and gloves. Fultz told her they were going to rob a bank. She was instructed to secure pillowcases for their use. The robbers left around 3:00 to 3:30 p. m. and returned about an hour later with a sack full of money. Later they all went to coconspirator Campbell's brother's house, where the money was split three ways. That evening she accompanied the three conspirators and Campbell's brother in a white van to Omaha, Nebraska; from there she and the conspirators traveled to the Houston area in the green Chevrolet where she and Fultz stayed at the Doby residence. A few days later, on June 6, she went to the FBI and gave a statement concerning the robbery which was not truthful in some details. On June 19th she gave a further statement which was consistent with her testimony at trial.

ready given a statement indicating Doby had been involved in the bank robbery. Initially Doby denied any knowledge of the robbery. The agent reiterated the above information. Doby then admitted his participation in the bank robbery and signed a detailed statement concerning the same including a description of what took place and the various roles played by the participants.

The trial court found the search of Doby's residence to be illegal and suppressed the bank guard's revolver seized in the search. In admitting Doby's confession, the court stated:

Defendant also seeks to suppress the incriminating statements made by the defendant to the F.B.I. agent while he was confined in jail, because Doby was confronted with illegally seized evidence which induced the confession. The relevant evidence seized in the search of the house was the revolver taken from the bank guard at the robbery. Defendant was also confronted with bait money which was legally seized and a detailed statement from a witness. The Court does not believe that reference to the revolver by the F.B.I. agent was sufficient to destroy the voluntary nature of the confession. The Court is of the opinion that the confession should not be suppressed.

Doby below argued that the confession was a direct product and fruit of the unlawful search of Doby's residence and also that the circumstances surrounding the taking of the confession made it involuntary. In this appeal Doby charged that the trial court ruled that the confession was admissible solely because of the "voluntary nature of the confession," and the trial court thereby applied an incorrect standard. We remanded this matter to the district court for the limited purpose of making further findings with respect to the admissibility or lack thereof of defendant's confession under both the Fifth and Fourth Amendments. See *Brown v. Illinois*, 422 U.S. 590, 600–02, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The district court's certification of its findings has now been filed with this court and reads in material part as follows:

The Court held that under the circumstances the confession was voluntary but made no reference to the Fourth Amendment claim. The Court has now reexamined the pertinent portions of the transcripts of the suppression hearing held September 21 and October 5, 1978 and now makes the following specific findings relating to the Fourth and Fifth Amendment claims of the defendant.

(1) That Mr. Doby's Fifth Amendment rights were not violated and that the confession was a product of his own free will in the Fifth Amendment sense.

(2) That Mr. Doby's Fourth Amendment rights were not violated. The confession was not a fruit of an illegal search. Although the court excluded the bank guard's revolver because of an unlawful search of the Doby residence, the bait money and the statement of Paula Ross tied Mr. Doby into the bank robbery very persuasively. Under these facts, the Court concludes that the confession was not the fruit of an illegal search because the reference by the F.B.I. agent to the gun found in Fultz's luggage did not materially affect Mr. Doby's decision to confess. In the Court's opinion Mr. Doby's decision to confess was an act of free will and was not materially influenced by his confrontation with illegally obtained evidence. There was not sufficient causal connection between the illegal search and the confession to require its exclusion.

■ We are satisfied that the trial court's findings with respect to admissibility of Doby's confession under both the Fifth and Fourth Amendments are not clearly erroneous. Doby does not in this appeal seriously challenge the voluntariness of his confession under the Fifth Amendment. He was fully warned of his *Miranda* rights and the record amply supports the finding that Doby's confession was voluntary.

The Fourth Amendment claim presents a closer issue because of Doby's claim that he was in part persuaded to confess when faced with the agent's statement that the

government knew the weapon seized from Doby's residence belonged to the bank guard at the Des Moines bank. The weapon was suppressed by the trial court because of its illegal seizure from Doby's residence. The trial court found that the confession was not the fruit of an illegal search because the reference by the FBI agent to the gun found in Fultz's luggage did not materially affect Doby's decision to confess. Rather, the bait money and the statement of an independent witness tied Doby into the bank robbery very persuasively. We agree with the trial court.

The record discloses that at the time the weapon in question was first removed from Fultz's luggage in Doby's residence Fultz immediately claimed ownership thereof. Doby himself testified during the suppression hearing that he had no knowledge of the gun being in Fultz's luggage and had no knowledge whatsoever about the gun. Under the circumstances we are satisfied that the trial court's conclusion that Doby's confession was not the fruit of an illegal search because it did not materially affect his decision to confess is not clearly erroneous. *See Brown v. Illinois, supra,* 422 U.S. at 600–03, 95 S.Ct. 2254; *Wong Sun v. United States,* 371 U.S. 471, 491–92, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Green,* 523 F.2d 968, 971–72 (9th Cir. 1975).

■ Doby next contends the court erred in failing to grant his motion to declare a mistrial because of the prejudice created by a comment of FBI Agent Marshall during the reading from the confession, as follows:

"I am aware that the contact with me concerns the robbery of the South Des Moines National Bank. I am 43 years of age, having been born 9–28–34. I completed 12th grade through the Texas Department of Corrections"—he has put it down as the TDC—"and received a GED," which is an equivalency degree.

Upon completion of Agent Marshall's testimony and out of the presence of jury counsel for Doby moved for a mistrial on account of Agent Marshall's voluntary interpretation of the words "through the Texas Department of Corrections." The court, in denying the motion, stated:

The situation is unfortunate. The record would be much clearer if Agent Marshall had not referred to TDC as the Texas Department of Corrections. However, the Court does feel that the reference was not an intentional effort to inject the criminal record of this Defendant into the record, but was a natural explanation or a statement of the title in full, rather than the use of the initials.

Both counsel for the Defendant and Government have indicated that they did not know what TDC meant * * *.

* * * Defense counsel did not make his objection immediately but, in my opinion, properly made it at this Bench at a different time that appeared to be more appropriate and didn't call particular attention to the reference.

The court offered to give a cautionary instruction if desired and further observed that "because of the evidence that has been presented, the error, if any, would be harmless."

On another occasion counsel for defendant Doby questioned the agent with respect to complaints by Doby with respect to an injury to his leg, as follows:

[Q.] Special Agent Marshall, at the time you interviewed Mr. Doby, did you have a conversation with him about his leg or his knee? Do you remember some comment about that?

A. I remember him making a comment about his leg, yes, sir.

Q. Didn't he tell you that he had an old injury with his leg that had been bothering him?

A. He said that he was—his leg was stiff because he had been sitting for so long. I believe we were there for about two hours and 20 minutes altogether, and he wanted to get up and move around, because it felt better when he was moving instead of just standing still—sitting still and being stiff. It was a bullet wound, I believe he said he had.

The court observed that:

It [the foregoing] was a reference again, more or less, in passing, and not wholly unresponsive, but more explanatory than not responsive, in which the agent referred to the limp being caused by a bullet wound or being told that the limp was caused by a bullet wound. This again would just as well have been left out of the record, but again I don't feel that that is a matter which is sufficiently prejudicial nor indicative of the fact that it might have been received in the commission of other crimes or criminal matters.

The court, with the approval of defendant's counsel, also gave the following as a part of its instructions: "The jury should not infer from anything that occurred during the proceedings that the defendant had any prior experience with the law."

We are satisfied that the court did not abuse its discretion in denying the mistrial. It is unfortunate that matters of this kind are sometimes volunteered by the witnesses. Here the trial court with the cooperation of counsel minimized the prejudicial effect of the statements made. We are satisfied that error, if any, was harmless. The government's evidence indicating Doby's guilt beyond a reasonable doubt is strong.

Finally appellant contends the trial court erred in allowing the government to amend its indictment. During the course of the trial the government amended its indictment to change the name of the bank from "South Des Moines National Bank" to the "Brenton Bank of South Des Moines." [4] Appellant concedes he was informed of the proposed change before the jury was impanelled, and does not claim any prejudice from this amendment. His sole contention is that he is entitled to be tried under an indictment returned by the grand jury, and the court erred in allowing the government to amend its indictment over his objection,

citing *Ex parte Bain*, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887). We disagree. The amendment is not one of substance. Appellant was informed of the change before the jury was impanelled and he concedes he was not prejudiced by the amendment. *See United States v. Powers*, 572 F.2d 146, 152 (8th Cir. 1978).

Affirmed.

---

4. The bank received its charter as the "South Des Moines National Bank" and was so known for 20 years. In December 1977 the bank changed its name to the "Brenton Bank of South Des Moines." The bank remained at the same location and the only change was in its name. There is no question that it was the bank that was robbed by the appellant on May 19, 1978.